UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

GIASSON AEROSPACE SCIENCE, INC. and
GIASSON DESIGN, INC.,

       Plaintiffs,

v.                                      Case No. 14-11358

RCO ENGINEERING, INC.,

       Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR ENFORCEMENT
OF PROTECTIVE ORDER AND GRANTING IN PART, DENYING IN PART
DEFENDANT'S MOTION TO DISMISS**

Pending before the court are a Motion for Enforcement of Protective Order (Dkt. # 13) filed on September 2, 2014 and a Motion to Dismiss Plaintiffs' First Amended Complaint (Dkt. # 18) filed on September 22, 2014 by Defendant RCO Engineering, Inc. ("RCO"). Having reviewed the briefs, the court concludes a hearing is unnecessary. *See* E.D. Mich. LR 7.1(f)(2). For the reasons stated below, the court will deny the Motion for Enforcement of Protective Order and grant the Motion to Dismiss in part.

**I. BACKGROUND**

**A. The Underlying Lawsuit and Settlement Agreement**

Plaintiffs Giasson Aerospace Science, Inc. and Giasson Design, Inc. (collectively, "Giasson") developed intellectual property related to the production and sale of aircraft seats. (Dkt. # 12, Pg. ID 38.) In a previous action filed on August 25, 2008 (No. 08-cv-13667), Giasson sued RCO alleging that RCO usurped the intellectual property and

used it in relation to a business opportunity with Gulfstream Aerospace Corporation ("Gulfstream"). *Id.*

The parties sought to settle the case. To that end, Giasson requested financial information to make an informed decision. (*Id.* at 39). RCO had provided certain financial information in the course of discovery, including "price of each . . . seat type, projected net profit for each seat type, and projected sales of seat sets through 2016." (Dkt. # 12-4 Pg ID. 76; *see also* Dkt. # 12-2, Pg ID. 64[1]). Settlement discussions proceeded based on this information (*Id.* at 75), and were ultimately successful.

On June 9, 2010, Giasson and RCO executed a "Confidential Settlement and Mutual Release Agreement" (the "Agreement"). (Dkt. # 12-5, Pg. ID 79.) Pursuant to Paragraph 2.3 of the Agreement, RCO agreed to pay Giasson a "Running Royalty based upon the Net Sales Price of Production Aircraft Seats" sold to Gulfstream over a ten year period.[2] (*Id.* at 81.) Paragraph 2.3(a) provided that

> during the First five (5) year period, RCO shall pay [Giasson] a Running Royalty of three and one half (3.5%) of the Net Sales Price of Production Aircraft Seats limited to Manual Seats and Power Seats. . . . During the First (5) year period, the Net Sales Price for the Manual Seat shall be $17,938.00 and the Net Sales Price for the Power Seat shall be $31,798.00. For the avoidance of doubt, the Running Royalty for the First five (5) year period shall be determined according to Table I[.]

(*Id.*) Table I listed these amounts as well as a Gross Sales Price and calculated the "Running Royalty Amount per seat," which amounted to $1,113 for the Power Seat and

---

[1] While RCO provided sales prices for its seats, it did so under the objection that "sales price may be subject to change as Gulfstream adjusts the technical requirement for the seats."

[2] The period was to commence "on the date that RCO is paid for the first Production Aircraft Seats." (*Id.* at 80).

$628 for the Manual Seat.  (*Id.*)  Paragraph 2.3(b) and the accompanying Table II set forth the Net Sales Price and Running Royalty Rate for the Second five year period in a similar fashion, specifying a figure for each type of seat.  (*Id.* at 81–82).

Paragraph 2.9 of the Agreement entitled Giasson "to annually audit RCO's document's which are reasonably necessary to ascertain or determine the number and types of Aircraft Seats ordered or paid for by Gulfstream under [the] Agreement."  (*Id.* at 83).

### B. Giasson's Audit and the Instant Action

On November 12, 2013, Giasson sought to exercise its right to audit RCO's sales, as it was entitled to do by Paragraph 2.9 of the Agreement.  (Dkt. # 12, Pg. ID 46.)  Giasson requested information from RCO regarding its sales to Gulfstream, including pricing information.  (*Id.* at 59–60.)  RCO refused to produce pricing information.  (*Id.* at 60.)

Giasson commenced this action on April 2, 2014 with the filing of the Complaint.  (Dkt. # 1.)  Giasson alleged that RCO breached the Agreement by unilaterally setting a premature "Milestone Date," specifically, the beginning date of the ten year period during which RCO would pay royalties to Giasson.  (*Id.* at 5.)  Giasson also alleged that RCO "refused Giasson's request for documents reasonably necessary to allow Giasson to exercise its rights under Section 2.9 of the Settlement Agreement."  (*Id.* at 6.)

On August 22, 2014, the parties entered into a stipulated protective order (Dkt. # 12), which was signed by Judge O'Meara, to whom this case was initially assigned.  On August 25, 2014, Giasson filed a First Amended Complaint ("FAC").  (Dkt. # 13.)  The FAC brings four causes of action.  First, Giasson alleges that RCO breached the

Agreement by not providing the price it charged to Gulfstream for Aircraft Seats. Second, Giasson alleges that RCO breached the Agreement by charging Gulfstream a Gross Sales Price greater than that set forth in the Agreement while calculating royalties based on the Net Sales Price fixed in the Agreement. Third, Giasson alleges that RCO fraudulently induced Giasson into entering into the Agreement by providing false information, namely the gross sales price for the aircraft seats. Fourth, Giasson alleges that RCO had a duty to disclose material financial information, namely the gross sales price for the aircraft seats, yet failed to do so, constituting silent fraud.

On September 2, 2014, RCO filed a Motion for Enforcement of the Protective Order. (Dkt. # 2). On September 8, 2014, the case was reassigned to the undersigned. On September 22, 2014, RCO filed a motion to dismiss the FAC. (Dkt. # 18.)

## II. STANDARD

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff and accept all the factual allegations as true. *Tackett v. M&G Polymers, USA, LLC,* 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009)). In doing so, "the court must draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Yet, the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 466 (6th Cir. 2000)). Although a heightened fact pleading of specifics is not required, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for

4

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Though decidedly generous, this standard of review does require more than the bare assertion of legal conclusions.

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the complaint's allegations are true.

*Twombly*, 550 U.S. at 555 (citing Fed. R. Civ. P. 8(a)). Further, the complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) *abrogated on other grounds by Twombly*, 550 U.S. 544. In application, a "complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) (citation omitted). Therefore, "to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citations and internal quotation omitted). A court cannot grant a motion to dismiss under Rule 12(b)(6) based upon its disbelief of a complaint's well-pled factual allegations. *Twombly*, 550 U.S. at 556.

### III. DISCUSSION

### A. Breach of Contract

Giasson's First and Second Causes of Action are easily disposed of. The Agreement unambiguously sets a fixed Net Sales Price, upon which the Running Royalty is based. There is no mechanism to adjust the Net Sales Price as RCO's actual costs and prices change over the ten year royalty period. The Agreement makes specific mention that "the Net Sales Price . . . *shall* be" a specific dollar value for each type of seat for both five year halves of the royalty period. (Dkt. # 12-5, Pg. ID 81 (emphasis added).) The Agreement further states that "for the avoidance of doubt, the Running Royalty . . . shall be determined according to Table[s I and II]." (*Id.*) Giasson's attempt to inject the very sort of doubt the clear language of the Agreement sought to avoid must be rejected. This interpretation is further buttressed by the audit provision of Paragraph 2.9, which contemplates Giasson receiving access to "RCO's documents which are reasonably necessary to ascertain or determine the number and types of Aircraft Seats ordered or paid for by Gulfstream under this Agreement." (*Id.* at 83.) The absence of a right to the actual *price* paid for the seats confirms that the royalty was meant to be paid according to a fixed price schedule. Giasson's assertions to the contrary, specifically its allegations that the royalty adjusts upward as RCO's Net Sales Price rises (but not downward if the Net Sales Price falls) find no support in the Agreement. Instead, it is clear that the Agreement conferred no right to access pricing information to Giasson because price information was irrelevant to calculating royalties due, and as such the First Cause of Action must be dismissed.

Similarly the plain language of the Agreement mandates the dismissal of the Second Cause of Action. Although the Agreement sets fixed Net Sales Prices for the purpose of calculating royalty payments, it does not specifically require that the Net

6

Sales Price be based on actual sales prices and costs going forward. This makes sense, because such a requirement would be impractical given the fluctuating nature of costs, specification, and the resultant prices. In any event, Giasson is unable to allege any damages it suffered as a result of RCO's alleged charging of higher-than-agreed-upon prices to Gulfstream. Giasson continued to receive its bargained for royalty for each seat sold to Gulfstream. It is of no moment that RCO may collect a higher (or lower) Sales Price from Gulfstream. As stated above, the actual Net Sales Prices have no effect on the royalties due, and the fluctuation of those Prices does not create a cause of action for Giasson. The Second Cause of Action must be dismissed.

### B. Fraud

Under Michigan law,[3] a plaintiff seeking to establish a claim for fraudulent inducement must establish that

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Uhl v. Komatsu Forklift Co.*, 512 F.3d 293, 304 (6th Cir. 2008) (quoting *Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006). Federal Rule of Civil Procedure 9 further requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P 9(b).

---

[3]The Agreement selects Michigan law, *see* Dkt. # 12-5, Pg. ID 85, and neither party disputes its applicability.

Giasson has adequately alleged fraud in the inducement. (Dkt. # 12, Pg. ID 50–51.) Giasson points to RCO's interrogatory answers containing the sales price of each type of aircraft seat. (Dkt. # 12-2, Pg. ID 64.) These figures were produced in January of 2010 in the lead up to the consummation of the settlement. Giasson's counsel specifically stated that the financials, including the price of the seats, "form[ed] the basis for the settlement discussions." (Dkt. # 12-4, Pg. ID 75.) Giasson alleges the later-discovered higher prices raise an appropriate inference of falsity. Rule 9(b) allows "[m]alice, intent, knowledge, and other conditions of a person's mind [to be] alleged generally." Fed. R. Civ. P 9(b).

RCO argues that the merger and integration clauses, Paragraphs 5 and 9.3 of the Agreement (Dkt. # 12-5, Pg. ID 85, 87), preclude a fraudulent inducement claim. Paragraph 5 states that "[a]ll tort claims are merged with this Agreement such that the only course of action relating to this Agreement shall be for contract damages" and Paragraph 9.3 states that "[t]his Agreement . . . sets forth the entire agreement and understanding between the Parties as to the subject matter of this Agreement, and supersedes all prior agreements, discussions, representations, amendments or understandings of every kind and nature between them." (*Id.*)

"[W]hen a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause." *LIAC, Inc. v. Founders Ins. Co.*, 222 F. App'x 488, 493 (6th Cir. 2007) (quoting *UAW-GM Human Resource Center v. KSL Recreation Corp.*, 4779 N.W.2d 411, 419 (Mich. Ct. App. 1998)). "There is an important distinction between (a)

8

representations of fact made by one party to another to induce that party to enter into a contract, and (b) collateral agreements or understandings between two parties that are not expressed in a written contract. It is only the latter that are eviscerated by a merger clause, even if such were the product of misrepresentation." *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 928–29 (E.D. Mich 2005). The fraud alleged here falls in the former category. RCO's alleged misrepresentation of the actual seat prices goes to the very heart of the Agreement and represents the entire basis of the bargain. In reply, RCO does not attempt to distinguish *Star*. The Fraudulent Inducement Cause of Action is not barred by the merger clause.

Although the Third Cause of Action survives, the inquiry going forward will be extremely narrow. The underlying financial information behind RCO's interrogatory responses will quickly confirm or deny their veracity at the time they were made. The survival of the fraud claim does not grant Giasson a license to pursue RCO's pricing information for any time after the alleged fraudulent representations were made. As RCO made clear at the time it responded to the interrogatory, as confirmed by common sense, "sales price may be subject to change." (Dkt. # 12-2, Pg. ID 64.) At no time did RCO represent that the future prices of aircraft seats sold to Gulfstream would remain static.

Giasson's Silent Fraud claim is essentially the same as its Fraudulent Inducement claim. As the allegation goes, "RCO had a duty to disclose Giasson . . . including the actual gross sales prices of the Production Aircraft Seat . . . , but failed to disclose . . . actual gross sales prices of the Aircraft Seats and, instead, represented that the gross sales prices were the same as those disclosed in RCO's response to

9

Giasson's discovery requests." (Dkt. # 12, Pg. ID 52.)  In reality, this allegation is not of an omission, as is required to establish silent fraud, *see McDonald v. Thomas M. Cooley Law School*, 724 F.3d 654, 665–66 (6th Cir. 2013), but an affirmative misrepresentation.  It makes little sense to expand the silent fraud doctrine to interpret every alleged misrepresentation of a material fact as an omission of the truthful version of that same fact.[4]  Because the FAC alleges a misrepresentation rather than an omission, the Fourth Cause of Action will be dismissed.

### C.Protective Order

RCO's Motion to Enforce Protective Order argues that RCO inadvertently produced unredacted pricing information and that Giasson knew the pricing information should have been redacted.  These documents were produced on July 10, 2014.  (Dkt. # 13, Pg. ID 135), over two months before the entry of the Protective Order. On August 27, 2014, five days after the entry of the Protective Order and two days after the filing of the FAC, RCO sought to designate this information as "Confidential-Attorneys Eyes Only" ("AEO") pursuant to Paragraph 3 of the Protective Order which states that

> Any party or non-party wishing to come within the provisions of this Protective Order shall designate, in writing, the documents, information, or portions thereof which he, she or it considers confidential at the time such documents are produced or such information is disclosed, or as soon thereafter as the person or entity seeking protection becomes aware of the nature of the information or materials disclosed and sought to be protected hereunder.

(Dkt. # 11, Pg. ID 26.)

---

[4]Silent Fraud also requires the additional element of a legal duty to disclose.  *Id.* Assuming, *arguendo*, that a duty to disclose arose out of RCO's discovery obligations in the previous action, it remains the incorrect cause of action for the instant case.

10

Notwithstanding the language of Paragraph 3 that allows belated designation of confidential documents, RCO cannot reach back in time before the execution of the Protective Order to correct an inadvertent disclosure that predated the Protective Order itself. Any action RCO took during the over two months between obtaining the documents and the entry of the Protective Order was clearly not subject to the restrictions of that Order. RCO cannot now seek to use the Protective Order to identify exactly who viewed the documents and obtain discovery as to communications regarding those documents.

RCO's citations to and discussions of Michigan ethics opinions do not implicate this instant motion. E.D. Mich. Local Rule 83.22 specifies that the Michigan Rules of Professional Conduct apply to members of this bar. Rule 1.0 of those Rules state that they "do not, however, give rise to a cause of action for enforcement of a rule . . . ." RCO cannot rely on any supposed ethical violation to obtain the relief it seeks. The motion is denied.[5]

## IV. CONCLUSION

IT IS ORDERED that Defendant RCO's Motion for Enforcement of Protective Order (Dkt. # 13) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Dismiss (Dkt. # 18) is GRANTED IN PART AND DENIED IN PART. It is GRANTED in that Counts One, Two,

---

[5]As set forth above, RCO's pricing information post-dating the allegedly fraudulent representations leading up to settlement is irrelevant to the resolution of this case and the denial of this motion is not to say that Giasson is entitled to any additional post-Agreement pricing information. It is not.

and Four of the First Amended Complaint are DISMISSED.  It is DENIED in all other respects.

                                               s/Robert H. Cleland  
                                               ROBERT H. CLELAND  
                                               UNITED STATES DISTRICT JUDGE

Dated:  November 14, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 14, 2014, by electronic and/or ordinary mail.

                                               s/Lisa G. Wagner  
                                               Case Manager and Deputy Clerk  
                                               (313) 234-5522